|  |  |
|---|---|
| S&P GLOBAL INC.,<br><br>               Plaintiff,<br><br>     v.<br><br>FORTESCUE METALS GROUP LTD and<br>CHICHESTER METALS PTY LTD,<br><br>            Defendants. | 20 Civ. ___<br><br><br>**COMPLAINT** |

## INTRODUCTION

1.       S&P Global Inc. ("SPGI") is the world's foremost independent publisher of financial news, information, and analytics, providing essential market intelligence to companies, individuals, and governments.  From its headquarters in New York, SPGI serves subscribers all over the country and around the world.  SPGI brings this action to enforce the plain terms of a contractual forum-selection clause and to vindicate its First Amendment right to continue to gather and publish financial news and information of public concern, notwithstanding the preference of defendant Fortescue Metals Group Ltd ("FMG") to evade press coverage of certain of its business activities.

2.       Through its S&P Global Platts division, SPGI is the leading independent provider of information and benchmark prices for the energy and commodities markets.  Together with its predecessors, SPGI has published information related to these markets for over 100 years, and today subscribers in more than 190 countries look to S&P Global Platts for its unparalleled expertise in news, pricing, and analytics and to deliver transparency and efficiency to the markets it covers.  FMG is itself a subscriber to SPGI's S&P Global Platts-branded content.

3.      FMG is seeking to prevent SPGI from continuing to publish newsworthy pricing information that FMG would prefer not be published.  FMG, which is based in Australia, is one of the largest producers of iron ore in the world.  No differently than thousands of other participants in international and global commodities markets, FMG not only subscribes to the information SPGI publishes under the S&P Global Platts brand but also (as is widely known in the marketplace) typically incorporates as an essential element of the price terms of its long-term supply contracts an S&P Global Platts-branded benchmark (or in some cases a similar benchmark offered by a competing publisher), subject to a premium or a discount that is adjusted on a monthly basis.  Although FMG has long acquiesced in the publication by SPGI and others of news articles reporting FMG's pricing practices, including the nature and extent of its discounting off of benchmark prices published by SPGI, FMG now contends, for the first time, that the discounts it offers off of SPGI's published benchmark prices are confidential.

4.      An order enjoining SPGI's publication of truthful, newsworthy information about an international commodities market—here, the market for iron ore products—would be a blatantly unconstitutional prior restraint.  A prior restraint is "the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n. v. Stuart*, 427 U.S. 539, 559 (1976).  As the most oppressive form of censorship, a prior restraint can be justified only in "exceptional cases," *Near v. Minnesota ex rel. Olson*, 283 U. S. 697, 716 (1931), and assuredly not to protect FMG's claimed commercial interests.  *See, e.g.*, *CBS Inc. v. Davis*, 510 U.S. 1315 (1994) (Blackmun, J., in chambers) (vacating stay of injunction against broadcast of claimed trade secrets).  Whatever restrictions FMG may impose on its own customers, via contract, with respect to their disclosure of FMG's pricing information to third parties, such restrictions cannot justify abridging SPGI's First Amendment rights to publish that information;

SPGI owes no contractual duty of confidence to FMG and obtains information about FMG through ordinary, lawful journalistic practices. Punishing the publication of truthful information "seldom can satisfy constitutional standards," *Smith v. Daily Mail Publ'g Co.*, 443 U. S. 97, 102 (1979), and "a stranger's illegal conduct does not suffice to remove the First Amendment shield from speech about a matter of public concern." *Bartnicki v. Vopper*, 532 U.S. 514, 535 (2001).

5. FMG agreed to litigate disputes such as this one in New York. Specifically, when it became a subscriber to SPGI's S&P Global Platts-branded content several years ago, FMG entered into a master subscription agreement ("MSA") in which FMG "consent[ed] to the exclusive jurisdiction of any courts located in the State of New York, County of New York, for the resolution of any disputes arising out of or related to this Agreement … *or the Platts Information*, and waive[d] any claim of inconvenient forum" (emphasis added). The MSA defines "Platts Information" to include the information in the relevant S&P Global Platts-branded publications. FMG also agreed that such disputes would be governed by New York law. The most recent MSA governing the relationship between FMG and SPGI, which FMG signed just last month, contains an identical provision and is attached hereto as Exhibit A.

6. The forum-selection clause expressly—and by design—extends beyond any dispute concerning the subscription agreement itself and instead reaches any dispute arising out of or related to the information in the relevant S&P Global Platts-branded publications. FMG's objections to SPGI's continued publication of its pricing information fall squarely within that broad forum-selection clause: In addition to the fact that FMG seeks to litigate a dispute about the contents of the Platts Information, the underlying price that FMG is trying to suppress is calculated based on a discount from a benchmark price that Platts publishes (and is part of the package to which FMG subscribes), further linking this dispute to Platts Information.

7. Enforcement of the forum-selection clause and the choice-of-law provision is particularly important to a U.S. media organization like SPGI that has customers all over the world. "A contractual provision specifying in advance the forum in which disputes shall be litigated and the law to be applied is [] an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 516 (1974). Without such a clause, SPGI could be haled into court by S&P Global Platts subscribers—which also tend to be the subjects of its coverage—virtually anywhere in the world, without the predictability or certainty afforded by litigation in one place (New York) and without the broad protection of the First Amendment for its journalistic activities.

8. In flagrant violation of the forum-selection clause, FMG sought to circumvent both the First Amendment and its own contractual obligations by turning to the UK courts. Based on unfounded claims of breach of confidence and disclosure of trade secrets, on April 17, 2020, FMG, together with its wholly-owned subsidiary, defendant Chichester Metals Pty Ltd ("Chichester" and, together with FMG, "Defendants") filed an action seeking an injunction and damages against SPGI in the High Court of Justice Business and Property Courts Chancery Division in London (the "UK Lawsuit").

9. On April 24, 2020, prior to any appearance by counsel for SPGI, the UK court issued a written injunction order (the "UK Order," attached hereto as Exhibit B) prohibiting SPGI, under penalty of contempt, from "(i) using the Confidential Information or any part thereof or otherwise publishing or exploiting the said Confidential Information or any part thereof and (ii) directly or indirectly procuring or soliciting details of the said Confidential Information or any part thereof from the Claimants' customers." *See* Ex. B at 2. Although the

issuing court has no jurisdiction to enjoin the lawful conduct of SPGI (a New York corporation domiciled in New York) in the United States or anywhere else outside of England and Wales, the order purports to apply to SPGI's activities anywhere in the world. Moreover, other than as to the FMG pricing information that SPGI (and others) already published in February and March 2020, it contains no exception for information that is otherwise publicly available.

10. SPGI brings this action to halt the ongoing violation of its contractual rights and to vindicate its First Amendment rights to gather and publish newsworthy financial information about international and global commodities markets. In particular, SPGI seeks (1) a declaration that it constitutes a breach of contract for FMG to pursue the UK Lawsuit, because FMG agreed to litigate in New York; (2) an injunction prohibiting FMG—whether directly or through its wholly owned subsidiary—from continuing to pursue the UK Lawsuit in breach of its contractual obligations to SPGI; (3) a declaration that the UK Order is unenforceable in the United States; (4) damages that SPGI has suffered as a result of FMG's breach; and (5) such other relief as this Court deems just and proper.

11. Quite simply, FMG's conduct violates two fundamental public policies of New York and the United States: First, it violates the principle that forum-selection clauses are presumptively enforceable, as they are an "indispensable element in international trade, commerce, and contracting." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 13-14 (1972). Second, it violates the fundamental public policy of freedom of the press enshrined in the First Amendment, which "embraces at the least the liberty to discuss publicly and truthfully all matters of public concern[,] without previous restraint or fear of subsequent punishment." *Thornhill v. Alabama*, 310 U.S. 88, 101-02 (1940). Indeed, it is axiomatic that "[t]he loss of

First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

12.     The First Amendment rights at stake in this case go to the heart of SPGI's business and extend far beyond SPGI.  If companies were allowed to prohibit the solicitation and publication of factual information about their businesses based on asserted violation of confidentiality obligations placed on employees and customers, it would severely disrupt time-honored journalistic practices and impede the flow of information that is vital to the public and to the capital markets.

13.     SPGI's S&P Global Platts division and other publishers that act as price reporting agencies provide a vital and universally accepted role in providing transparency to commodities markets, which helps ensure orderly trading and promotes competition, which in turn leads to more efficient markets.  Participants in the world's largest and most important commodities markets have long relied on price reporting agencies and the benchmark assessments they produce both in  agreeing to physical supply contracts and in settling commodity derivatives instruments used for market risk management purposes.  For years, this also has been true for the iron ore market in which FMG operates.  By promoting price transparency, SPGI and other publishers help to foster the substantial public interest in efficient markets.  FMG, in contrast, seeks to protect only its own narrow commercial interest by imposing opacity for its pricing alone in the hopes that an uneven playing field will allow it to charge higher prices.

14.     News organizations routinely rely on confidential information obtained from confidential sources to report on matters of legitimate public interest, and the First Amendment fully protects their right to do so.  U.S. media companies are entitled to use and enforce forum-selection clauses and choice-of-law provisions in their contractual dealings with counterparties in

other countries in order to prevent being haled into foreign courts and subjected to foreign laws that would apply a different standard and less solicitude for a free press.

15.     Accordingly, this Court should grant the requested relief forthwith.

## THE PARTIES

16.     Plaintiff SPGI is a New York corporation with headquarters at 55 Water Street, New York, New York 10041.

17.     Defendant FMG is an Australian company with headquarters at Level 2 87 Adelaide Terrace, East Perth, Western Australia 6004, Australia.

18.     Defendant Chichester, a wholly owned subsidiary of FMG, is an Australian company that also has its headquarters at Level 2 87 Adelaide Terrace, East Perth, Western Australia 6004, Australia.  Upon information and belief, Chichester is the entity through which FMG contracts with counterparties for the sale of the iron ore products FMG produces.

## JURISDICTION AND VENUE

19.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Plaintiff SPGI is a New York corporation, Defendants are Australian corporations, and the sum in controversy exceeds $75,000.

20.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because FMG consented to venue and jurisdiction in this district and that consent is binding on Chichester, its wholly-owned subsidiary, here.  Venue is also proper because a substantial part of the events or omissions giving rise to the claim occurred in this district.

21.     This Court has authority to issue a declaratory judgment pursuant to 28 U.S.C. § 2201.  An actual case or controversy has arisen between the parties:  FMG has already breached the MSA by pursuing litigation arising from or related to the Platts Information in a court outside New York, namely, in the United Kingdom.  Moreover, in that litigation, Defendants have

obtained an injunction against SPGI in the UK that purports to restrict SPGI's exercise of its

First Amendment rights in the United States, and Defendants are likely to attempt to enforce the

order against SPGI in New York.  But for that injunction, SPGI currently would be engaging in

newsgathering efforts in an effort to learn and publish FMG's latest contract prices, no

differently than SPGI is currently doing with respect to other producers.  Instead, SPGI has been

forced to direct its personnel to halt these newsgathering efforts and has taken other steps to

come into compliance with the UK Order that Defendants never should have been able to obtain.

## FACTUAL BACKGROUND

22.     SPGI is a leading publisher of financial news, information, and analytics.  Its

world-famous brands include S&P Global Ratings, S&P Global Market Intelligence, S&P Dow

Jones Indices, and S&P Global Platts.  SPGI is based in New York, with its headquarters on

Water Street in Manhattan.  It employs reporters, editors, and other staff to support its

journalistic activities in numerous countries around the world.

23.     Each day, as it has for more than 100 years, SPGI (through its S&P Global Platts

division) publishes real-time news, market reports, commentary, fundamental market data and

analytics, and thousands of daily price assessments that are widely used as benchmarks in the

physical and futures markets for oil, natural gas, LNG, electric power, coal, shipping,

petrochemicals, metals, and agriculture.  SPGI's publications bring transparency to the markets

and help subscribers to monitor market movements, value commodities, recognize opportunities,

mitigate risk, and plan with greater confidence.

24.     SPGI's customers include traders, analysts, risk managers, purchasing agents, and

other professionals at many thousands of public and private sector organizations in over 190

countries.  Market participants, including, but not limited to, employees and customers of the

companies on which SPGI reports, serve as primary sources for SPGI's news stories.

25.     Under its S&P Global Platts brand, SPGI distributes financial news and information of the type at issue here through numerous means, including, but not limited to: (i) print and electronic publications such as *Platts Metals Alert*, *SBB Daily Brief* and *Steel Markets Daily*; (ii) websites such as www.spglobal.com and www.steelbb.com; (iii) third-party distribution partners, such as Bloomberg; and (iv) emails to subscribers.

26.     S&P Global Platts is an unincorporated division of SPGI.

27.     Like SPGI more broadly, the S&P Global Platts division has a global presence. Reporters and editors who contribute to S&P Global Platts-branded content are based in numerous countries around the world.  Regardless of where reporters are based, they have access to an SPGI "Content Creation Platform" on which (as the name suggests) they create the content they wish to submit for publication.  All of the content reporters submit for editorial review and publication is sent to a content repository in the United States.  Following editorial review by a U.S.-based editorial team, the various forms of content at issue are published in United States and distributed from the United States to customers worldwide via a cloud-based server.  The central technology hub for SPGI's S&P Global Platts-branded content and its publishing activities is in the United States.  SPGI maintains a second technology hub for Platts in the Republic of Ireland.

28.     Through its S&P Global Platts division, SPGI plays a central role in the efficient, transparent functioning of commodities markets, including iron ore markets, by means of its timely publication of news about those markets and the dissemination of the proprietary Platts Iron Ore Index ("IODEX"). IODEX is a widely-used benchmark assessment of the spot price of physical iron ore.  SPGI calculates the daily value of IODEX and the various assessments particular to specific grades of iron ore and trading locations using a sophisticated survey of bids

and offers in the marketplace.  *See generally* https://www.spgobal.com/platts/en/our-methodology/methodology-specifications/metals/iron-ore-methodology.  Since 2010, IODEX has served as the primary, physical-market pricing reference for seaborne iron ore fines into China, the biggest importer of this key ingredient in the steelmaking process.  Numerous companies, including FMG, use SPGI's IODEX assessments as benchmark prices when setting or negotiating the pricing of long-term supply contracts.

29.    SPGI's role as a price reporting agency, and its role as a news organization in reporting on the market more generally, both depend on canvassing a range of market participants on a daily basis, and both of these activities contribute to the efficient functioning of the market.  The following testimonials attest to the positive role SPGI plays in this regard:

- "The transformation of iron pricing 10 years ago provided all participants in the industry with an opportunity to better manage their price risk.  It has brought more mature dynamics to the market and attracted many new people to participate in one of the world's largest traded commodities."  Jason Keys, Ferrexpo Group

- "S&P Global Platts has been a progressive force in the evolution of the iron ore market, by consistently and efficiently performing their price discovery role, helping to build in a strong benchmark upon which other developments and achievements have built."  Yang Bin, Hunan Valin Steel

- "Prior to 2008 iron ore was seen as a niche and opaque commodity. The benefits of iron ore indexation have encouraged evolution in other steel derivative markets such as scrap, lump, rebar and hot rolled coil."  Phillip Killicoat, Goldman Sachs

- "We rely on what Platts does. We use the very reliable indexes produced on a daily basis by Platts, and Platts has been extremely good [in] terms of keeping up with the markets' needs. I commend them for that."  Lourenco Goncalves, Cleveland-Cliffs.

*See* https://www.spgobal.com/platts/en/products-services/metals.

30.    Like other major producers, FMG sells iron ore in two ways:  (1) on the spot market, pursuant to spot market contracts at a spot market price; and (2) pursuant to long-term

contracts negotiated with customers.  The majority of its product is sold pursuant to long-term contracts.

31.     FMG does not contend that the spot market price is confidential; indeed, FMG provides the spot price information directly to SPGI for inclusion in its spot iron ore price assessments.

32.     In FMG's long-term contracts, it sets a discount price referred to in shorthand as the "DMTU Discount," which is a discount off of a benchmark IODEX index price that SPGI publishes.  DTMU is short for "dry metric ton unit," which is an agreed-upon unit of measure for iron ore pricing.  FMG renegotiates the DMTU Discount on a periodic basis to account for changing market conditions.

33.     FMG has subscribed to S&P Global Platts publications since at least 2014.  During that time it has consistently (and most recently in March 2020) signed MSAs that have required it to consent to the exclusive jurisdiction of courts located in New York county over all claims "arising out of or relating to this Agreement . . . or the Platts Information."  The current MSA, like the previous MSAs that FMG signed, defines "Platts Information" as Platts' proprietary products and services and "the information contained in" those publications, which includes the information in *Steel Markets Daily*, *SBB Daily Brief*, and *Platts Metals Alert*, and the related information provided to subscribers through associated web sites and email alerts.  The MSA also provides that any such covered disputes are to be governed by applicable U.S. law and the laws of the State of New York.

34.     The broad language in the forum selection clause ensures not only that contract-related claims arising out of the MSA itself are brought in New York and subject to New York law (*i.e.*, claims arising out of or related to the Agreement itself) but also that subscribers who

wish to assert tort claims arising out of or relating to the S&P Global Platts-branded content that SPGI publishes must bring those claims in New York under U.S. and New York law as well. This provides critical predictability and protection to SPGI for its publishing activities by ensuring that subscribers' claims arising out of or relating to S&P Global Platts-branded content are consolidated in a single forum, with well-known predictable rules, and are subject to the broad protection of the First Amendment for SPGI's journalistic activities. Conversely, because many subscribers to SPGI's S&P Global Platts-branded content are also the subject of its reporting, this broad language helps to avoid the possibility of SPGI facing litigation about the content of its publications in courts all over the world, under different legal systems that are less protective of free speech—in some cases far less so.

35. SPGI has regularly published FMG's contract prices, sourced from FMG customers and other market sources, since late 2013. Other trade publications also have done so, including Reuters, a leading international news agency; Argus Media Limited ("Argus"), another prominent international media organization and price reporting agency with a focus on energy and commodities markets; MySteel Global, a China-based online pricing and intelligence service; Fastmarkets, a UK-based price reporting and intelligence service for multiple commodities markets, including metals markets; and Shanghai Metal Markets, a China-based metals market research company. SPGI also regularly publishes comparable price-related information about competing suppliers of iron ore and countless other producers in the global energy and commodities markets.

36. The fact that SPGI and other publishers have published this information makes clear that it is newsworthy. Indeed, transparency about long-term pricing information in this

context is particularly important to the markets because most iron ore is traded under long-term contracts rather than at spot prices, and FMG is one of the world's largest producers of iron ore.

37.     Nonetheless, FMG now contends in the UK Lawsuit that the DMTU Discount price is not publicly available, that its customers are contractually bound to keep it confidential, and that protecting its secrecy allows it to maintain a competitive advantage in the marketplace. To the contrary, information about such prices circulates widely among market participants— FMG customers and non-customers alike.

38.     On February 20, 2020, SPGI published an article in *Steel Markets Daily* entitled "Fortescue trims discount for March FBF, SSF iron ore contracts: Customers." The article, citing "contract customers" of FMG as well as "[m]arket sources," reported FMG's discounts (its contract price) for March-loading cargoes. A copy of that article is attached hereto as Exhibit C.

39.     In a letter sent to SPGI on February 21, 2020, FMG claimed that SPGI had obtained details of its March contract pricing "through a breach of confidence," and it requested that SPGI "cease publishing details of Fortescue's pricing," remove it from any SPGI publications, and "not publish or solicit details of Fortescue's pricing in the future" on the ground that it is "confidential and unauthorized" and that its disclosure is "a breach of contract."

40.     SPGI does not owe any duty of confidence to FMG as to its pricing (or any other) information.

41.     In response, SPGI advised FMG (on March 3, 2020) that "[a]ll of the information reported in the abovementioned article was widely known in the market, and was obtained through lawful and standard journalistic practices," and it refused to refrain from publishing or soliciting such information in the future or to remove it from existing publications.

42.     SPGI's representation to FMG that FMG's purportedly confidential information was "widely known in the market" was based on its own ordinary-course surveys of market participants, who regularly disclose that information to SPGI.  This information is widely available in the marketplace, including among market participants who are not themselves bound by any contractual or other duty owed to Defendants, independent of its publication by SPGI.

43.     For example, FMG's pricing routinely appears on Weibo, a Chinese microblogging platform with hundreds of millions of users, where it is publicly accessible without a password before SPGI publishes it.  Pricing details for FMG's long-term supply contracts often appear on Weibo at least several hours before being published by SPGI. In subsequent correspondence, FMG warned SPGI not to publish its contract pricing for April 2020, but SPGI again exercised its First Amendment right to do so.  Specifically, in the March 24, 2020 issue of *Steel Markets Daily*, SPGI published an article entitled "Australia's FMG narrows discount for Apr iron ore fines as end-users opt for lower grades."  The article reported that, according to FMG customers, FMG had "narrowed the discounts for its April-loading term contracts for four iron ore grades," and it reported FMG's price for such contracts as against Platts' IODEX assessments.  A copy of that article is attached hereto as Exhibit D.

44.     The March 24 publication prompted FMG, in letters dated March 26 and March 30, 2020, to reiterate its demand that SPGI stop publishing FMG's contract prices, and to threaten to seek injunctive relief in court.  In the March 30 letter, FMG stated that it would "take whatever legal steps are necessary to protect our interests, including seeking injunctive relief against S&P Global Platts," and it requested "the correct address for service including the correct entity and forum."

45.     SPGI responded on March 31 by explaining again that the pricing information "was obtained through lawful and standard journalistic practices"; that, as a media company, SPGI "believes firmly in the importance of a free and independent press"; and that it would not accede to FMG's demands.  SPGI also provided FMG with its New York address for service of process in the event FMG wished to pursue the matter further and (consistent with the forum-selection clause in the MSA) advised that the correct forum was "the State and Federal Courts of New York."

46.     On April 17, 2020, Defendants commenced the UK Lawsuit to prevent SPGI from publishing contract pricing of their iron products on the ground that it constitutes confidential information and/or a trade secret and from procuring or soliciting such information from FMG's customers.  Defendants also requested damages for breach of confidence and/or disclosure of trade secrets.  In the same action, Defendants asserted similar claims against Argus, seeking comparable injunctive relief.

47.     The dispute at issue in the UK Lawsuit arises out of or relates to the contents of S&P Global Platts publications to which FMG subscribes, including *Steel Markets Daily*, which regularly publishes the pricing information FMG is seeking to censor.

48.     The UK Lawsuit constitutes a breach of the MSA and is an apparent effort to evade a New York forum, where courts would emphatically reject FMG's effort to censor SPGI's newsgathering and reporting.

49.     On April 23, 2020, in a telephonic hearing, the UK court (per HHJ Hacon) issued an oral order enjoining SPGI from publishing or otherwise disclosing FMG's "confidential information" until April 30, 2020, or a further order from the court following an *inter partes* hearing before that date.

50. On April 24, 2020, the UK court issued a written injunction order restraining SPGI from "(i) using the Confidential Information or any part thereof or otherwise publishing or exploiting the said Confidential Information or any part thereof and (ii) directly or indirectly procuring or soliciting details of the said Confidential Information or any part thereof from the Claimants' customers." UK Order, Ex. B at 2.

51. The UK Order purports to restrain SPGI globally—including in the United States—from engaging in constitutionally protected newsgathering and publishing activities. The order contains no exception for information that is (i) published by a competing financial publisher (none of which is subject to the injunction), (ii) disseminated on Weibo or another social media platform, or (iii) otherwise made available to the public.

## CLAIMS FOR RELIEF

### CLAIM ONE
### (Breach of Contract)

52. SPGI incorporates by reference the allegations in paragraphs 1 through 51, inclusive.

53. FMG's initiation of the UK Lawsuit constitutes a breach of the MSA. The MSA contains a forum-selection clause pursuant to which the parties "consent to the exclusive jurisdiction of any courts located in the State of New York, County of New York, for the resolution of any disputes arising out of or related to this Agreement . . . or the Platts Information." MSA, Ex. A, § 9 (effective date March 1, 2020). The MSA defines the term "Platts Information" to include the contents of *Steel Markets Daily* and the other SPGI publications that have published FMG's contract pricing information. *Id.* § 1.

54. The UK Lawsuit is clearly a dispute arising from or relating to the Platts Information: FMG is objecting to Platts Information by contending that the *Steel Markets Daily*

should not be pemitted to include FMG's long-term pricing information (which itself is calculated based on a discount from a Platts-published index price). Indeed, the UK Order currently enjoins SPGI from soliciting and publishing that specific Platts Information. Accordingly, the UK Lawsuit falls within the scope of the MSA's forum-selection clause.

55.    FMG's initiation of the UK Lawsuit—after SPGI advised it that the proper forum for any litigation against it arising out of or relating to "Platts Information" was New York—was a willful breach of the forum selection clause.

56.    FMG's breach of the MSA is causing SPGI to suffer money damages incurred as a result of being forced to litigate outside New York in violation of the forum-selection clause and as a result of complying with the mandated restrictions on newsgathering and publication, in addition to the irreparable harm SPGI is suffering as a result of being subject to a prior restraint on publication.

57.    Had FMG complied with the forum selection clause and sued SPGI in New York, it would not have been able to obtain an injunction against future publication as such relief is squarely foreclosed by the First Amendment, as confirmed by applicable precedent.

58.    By instead breaching the MSA and engaging in forum shopping, FMG was able to improperly obtain a worldwide injunction against SPGI in the UK Lawsuit. FMG's procurement of the UK Order contravenes the strong public policy in favor of enforcing choice-of-forum provisions. The Supreme Court has made clear that forum-selection clauses are presumptively enforceable, describing them as "an indispensable element in international trade, commerce, and contracting," *M/S Bremen,* 407 U.S. at 13-14, and as having "the salutary effect of dispelling any confusion about where suits arising from the contract must be brought and defended," *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 593-594 (1991).

59.     As a result of FMG's breach, SPGI has been forced to expend significant resources to bring its global operations into compliance with the UK Order, including by refraining from gathering and publishing information that is unquestionably newsworthy.  As a result of FMG's breach, SPGI also has been forced to engage counsel to contest the UK Order and the English Court's jurisdiction to hear the UK Lawsuit, as well as counsel in New York to contest continuation of the UK Lawsuit, thereby incurring incremental legal fees and costs. Accordingly, SPGI is entitled to a declaration that (i) FMG breached the MSA by bringing the UK Lawsuit and (ii) it constitutes a further breach for FMG to continue pursuing the UK Lawsuit or any other litigation arising from or relating to the Platts Information in any forum outside New York.

60.     SPGI is entitled to an injunction requiring FMG to cease and desist its litigation efforts in the UK, except for any effort to transfer venue to a court in New York.

61.     SPGI is entitled to an award of damages.

**CLAIM TWO**
**(Declaratory Judgment that the UK Order Is Unenforceable in the United States)**

62.     SPGI incorporates by reference the allegations in paragraphs 1 through 61, inclusive.

63.     FMG's pricing information of the type at issue here is a matter of public concern. SPGI and other financial news publishers have reported this information many times over many years.

64.     The First Amendment protects SPGI's right to solicit and publish FMG's iron ore contract pricing information without regard to whether Defendants consider the information to be confidential; without regard to whether FMG requires its customers not to publicly disclose such information; and without regard to whether the information is, in fact, confidential.

65.     SPGI has for years obtained FMG's contract pricing information, and that of many other energy and commodities producers, from customers and other market participants, including from sources who did not obtain the information directly from FMG.  Such information circulates widely in the marketplace and is published regularly not only by SPGI but also by competing publishers such as Argus and Reuters.

66.     Prior to February 21, 2020, FMG had never objected to SPGI's reporting of its iron ore contract pricing even though SPGI had engaged in such reporting since late 2013. FMG's sudden about-face and demand that SPGI stop a longtime reporting practice calls into question the true motivation for, and the credibility of, its confidentiality claims.

67.     SPGI is not a party to whatever contracts Defendants may have with their customers and is not bound by whatever confidentiality restrictions might be contained therein or by any other obligation of confidentiality toward Defendants.  As the Supreme Court has observed, "it would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law-abiding third party." *Bartnicki*, 532 U.S. at 529-30.

68.     SPGI's right to continue to publish articles that contain FMG's long-term supply pricing is fully protected by the First Amendment, and SPGI's newsgathering process is likewise fully protected.  The UK Order, even if temporary, is an unconstitutional prior restraint on these activities.  *See Alexander v. United States,* 509 U.S. 544, 550 (1993) ("[C]ourt orders that actually forbid speech activities are classic examples of prior restraints.").  FMG cannot, as a matter of law, demonstrate harm that comes anywhere close to warranting such extraordinary relief.

69. The mere fact that FMG put SPGI on notice of its objection to publication of its contract pricing does not justify a prior restraint against the lawful acquisition and publication of truthful, newsworthy information by a media company.

70. Foreign judgments like the UK Order that are inconsistent with the First Amendment are not enforceable in the United States as a matter of comity, as they are based on laws that provide substantially less protection for speech than the First Amendment and therefore contravene the most fundamental of this country's constitutional rights as well as the public policy of the United States.

71. In addition to violating the First Amendment, enforcing the UK Order would fail to protect Defendants' commercial interests because FMG's contract pricing information is, as noted, widely available other than from SPGI's publications; it is disseminated broadly in the marketplace by FMG's customers and other market participants; it is published by competitors of SPGI; and it is even posted on social media sites such as Weibo. At the same time, the UK Order inflicts competitive harm on SPGI as against its competitors who are not enjoined and deprives the iron ore market of information that plays an important role in its efficient operation.

72. If companies like FMG were allowed, via forum shopping, to obtain censorious foreign judgments directed at U.S. publishers and to enforce those orders in the United States without regard to the First Amendment, it would cripple SPGI's business, which is built on the timely publication of competitively valuable factual market information and analysis of same. It also would set a precedent that would throw into question the legality of the standard journalistic practice of using confidential sources to obtain either actual or asserted confidential information about matters of public interest—commercial and otherwise.

73.     The precedent set by enforcing the UK Order—in the unlikely event it were to be upheld on appeal—would hand businesses a means of shutting down confidentially sourced reporting on their operations based solely on its desire to keep the information secret.  Such censorship is anathema to the First Amendment, and this Court should refuse to be a party to it.

74.     Accordingly, SPGI is entitled to a declaration that the UK Order, and any subsequent order to the same effect issued by the UK court, is unenforceable against SPGI in the United States and to an injunction barring its enforcement.

## PRAYER FOR RELIEF

WHEREFORE, SPGI respectfully requests that the Court:

A.  Enter a judgment declaring that FMG breached the MSA by bringing the UK Lawsuit against SPGI, in violation of the MSA's forum-selection clause vesting exclusive jurisdiction over disputes arising from or related to the Platts Information in New York courts;

B.  Enter a judgment declaring that it constitutes a breach of contract for FMG to continue pursuing the UK Lawsuit, or any other litigation arising from or relating to the Platts Information, in any forum outside of New York;

C.  Enjoin FMG from further pursuit—whether directly or through a subsidiary—of litigation against SPGI within the scope of the MSA's forum-selection clause, including, but not limited to, any effort to enforce the wrongfully obtained UK Order, in any court other than one located in New York county;

D.  Enter a judgment declaring that the UK Order, and any subsequent injunction awarded to Defendants by any UK court based on the same or similar claims, is unenforceable in the United States;

E.   Award SPGI damages to be determined at trial on its breach of contract claim; and

F.  Enter such other further relief to which SPGI may be entitled as a matter of law or

equity, or which the Court determines to be just and proper.

Dated:  New York, New York
        April 29, 2020

Respectfully submitted,

By:  /s/ Benjamin E. Marks

Benjamin E. Marks
Jonathan Bloom
Sarah Ryu
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Tel:  (212) 310-8000
Fax:  (212) 310-8007

Zachary D. Tripp
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW
Washington, DC  20036

*Attorneys for Plaintiff S&P Global Inc.*